

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-14-00622-CV

Marisela G. **SALAS**, Individually and as Representative of the Estate of Martin Suarez and as
Next Friend of Keyla Marizel Salas Suarez, Minor,
Appellant

v.

**ALLEN KELLER CO. I, L.L.C.** d/b/a Allen Keller Co.,
Appellee

From the 216th Judicial District Court, Gillespie County, Texas
Trial Court No. 13410
Honorable N. Keith Williams, Judge Presiding

Opinion by:    Karen Angelini, Justice

Sitting:       Karen Angelini, Justice
               Marialyn Barnard, Justice
               Rebeca C. Martinez, Justice

Delivered and Filed:  August 19, 2015

AFFIRMED

Appellant Marisela G. Salas brought a wrongful death suit against Appellee Allen Keller

Co. I, L.L.C. d/b/a Allen Keller Co. ("AKC") in her individual capacity, as representative of her

husband's estate, and as next friend of her daughter. Salas's husband, Martin Suarez, was killed

while working for a subcontractor, C&B White Services, Inc. ("C&B"), on a highway construction

project. Salas sued the general contractor, AKC, for negligence. AKC moved for a traditional

summary judgment, arguing that because Suarez's employer, C&B, was an independent

subcontractor, AKC did not owe any duty to Suarez, C&B's employee. The trial court granted

AKC's motion for summary judgment, and Salas appealed. We affirm the trial court's summary judgment.

## BACKGROUND

The deceased, Suarez, was employed by C&B to work as part of a concrete crew on a highway project near Blanco, Texas. C&B was a subcontractor on the project, and AKC was the general contractor. The Texas Department of Transportation was the "owner" of the project. The written construction subcontract between C&B and AKC provided that C&B was responsible for performing concrete work around and under the guardrails of the highway. Pursuant to the contract, C&B represented that it was "capable and experienced in the type of construction" described and would supply its own "materials, labor, tools, and equipment." C&B agreed to procure its own commercial general liability insurance, automobile insurance, and workers' compensation insurance. C&B also agreed to indemnify AKC and "assume entire responsibility and liability for any claim or actions based on or arising out of injuries, including death, to persons or damages to or destruction of property, sustained or alleged to have been sustained in connection with or to have arisen out of or incidental to the performance" of the contract by C&B. C&B also agreed to "take all reasonable safety precautions in the execution" of its work and to "comply with all applicable laws, ordinances, rules, regulations, and orders of any public authority for the safety of persons."

Under this written contract, C&B was not required to perform traffic control. However, the undisputed summary judgment evidence shows that after C&B and AKC entered into the contract, they orally modified the contract whereby C&B agreed that it would perform traffic control and would charge AKC an additional amount for this additional duty.

On the day of the accident, July 11, 2012, C&B's concrete crew had been performing traffic control for about a month. When the crew arrived, they began the process of setting out

construction warning signs on the highway. They took the road signs from storage and placed them in the bed of a pickup truck. Suarez and another crew member then got into the bed of the pickup truck and straddled the tailgate in an effort to place the road signs on the highway. As the pickup truck began to move, the wind blew one of the road signs out of the bed of the pickup truck. The sign knocked Suarez and the other crew member to the ground. Suarez sustained a severe head injury and died later that same day.

### STANDARD OF REVIEW

To obtain a traditional summary judgment, a party moving for summary judgment must show that no genuine issue of material fact exists and that the party is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). In reviewing the grant of a summary judgment, we must indulge every reasonable inference and resolve any doubts in favor of the respondent. *Johnson*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 549. In addition, we must assume all evidence favorable to the respondent is true. *Johnson*, 891 S.W.2d at 644; *Nixon*, 690 S.W.2d at 548-49. A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of the plaintiff's cause of action. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex. 1991). Once the movant has established a right to summary judgment, the burden shifts to the respondent to present evidence that would raise a genuine issue of material fact. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

### DUTY

Negligence consists of three essential elements: (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 94 (Tex. App.—Eastland 2006, pet.

denied). AKC argued in its motion for summary judgment that it did not owe a duty to Suarez because the summary judgment evidence proved that Suarez's employer was an independent subcontractor. Whether a general contractor owes a duty to a subcontractor's employees is governed by "well-established law." *See Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001) ("The parties agree that the duty in this case is governed by our well-established law concerning a general contractor's duties to a subcontractor's employees."). "Ordinarily, a general contractor does not owe a duty to ensure that an independent contractor performs its work in a safe manner." *Id.* However, a limited duty arises "if the general contractor retains some control over the manner in which the independent contractor performs its work." *Id.*

"The general contractor's duty of care is commensurate with the control it retains over the independent contractor's work." *Id.* "Thus, it is not enough to show that the defendant controlled one aspect of [the plaintiff]'s activities if his injury arose from another." *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 214 (Tex. 2008); *see also Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 357 (Tex. 1998) (requiring a "nexus" between the general contractor's retained supervisory control and the condition or activity that caused the plaintiff's injury). The supervisory control retained or exercised "must relate to the activity that actually caused the injury." *Coastal Marine Serv. of Tex., Inc. v. Lawrence*, 988 S.W.2d 223, 226 (Tex. 1999) (per curiam).

"A general contractor can retain the right to control an aspect of an independent contractor's work or project so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control." *Lee Lewis Constr.*, 70 S.W.3d at 783. According to the summary judgment record, it is undisputed that AKC did not have a contractual right to control C&B's performance of traffic control. Instead, the issue is whether AKC actually exercised control over C&B's performance of traffic control. For AKC to have exercised control in a manner that would give rise to a legal duty to C&B's employees, the

evidence must show more than AKC having "a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations." *Elliot-Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex. 1999) (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). Such general rights "do not mean that the [subcontractor] is controlled as to his methods of work, or as to operative detail." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). Instead, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way." *Id.* (quoting RESTATEMENT (SECOND) OF TORTS § 414 cmt. c (1965)). Thus, a general contractor "who gives on-site orders or provides detailed instructions on the means or methods to carry out a work order owes the independent-contractor employee a duty of reasonable care to protect him from work-related hazards." *Hoechst-Celanese Corp*, 967 S.W.2d at 357. However, a general contractor who does not provide detailed instruction on the method or means of how to perform the job does not retain supervisory control that would give rise to a legal duty to the subcontractor's employees. *See Transit Mix Concrete*, 205 S.W.3d at 95 (explaining that while the general contractor assigned the independent subcontractor employee the task of repairing the brakes, the general contractor did not provide detailed instruction on the method or means of how to perform the job and was not in a supervisory role over the independent subcontractor employee).

AKC argued in its motion for summary judgment that the undisputed summary judgment evidence showed that C&B was an independent contract and that AKC did not control the performance of C&B's work relating to traffic control in a manner that would give rise to a legal duty. On appeal, Salas contends the trial court erred in granting summary judgment because she raised an issue of material fact regarding whether AKC exercised supervisory authority by

controlling the means, methods, or details of C&B's performance of traffic control.[1] We disagree with Salas and conclude that the summary judgment record shows that AKC did not control the performance of C&B's traffic control in a manner that would give rise to a duty owed to Suarez.

In his deposition, Roberto Moreno Castillo, the driver of C&B's pickup truck and the C&B leader of Suarez's crew, testified that it was part of his crew's job to put the traffic signs out at the beginning of each work day in an effort to warn motorists that the crew was working on the highway. Castillo's crew was also responsible for picking up the signs at the end of the work day. Castillo testified that a "person from [AKC] had told us how he wanted the cones placed." According to Castillo, the men on his crew knew where to place the traffic signs because they had been instructed how to do so by Casey White, president of C&B. Castillo testified that when his men were placing the signs, they usually sat "in the rear of the [pickup] truck." However, on the day in question, the men straddled the tailgate. Castillo testified that this was the first time he had ever seen them straddle the tailgate. According to Castillo, he told them to sit inside the cabin of the pickup truck: "I had told them to sit inside the bed, and they said they would. But once I got started, I noticed that they had not sat inside the bed, that they were just straddling the tailgate. That's why I was driving so slowly."

Casey White, president of C&B, testified in his deposition that traffic control is "from signage to cones." "It's anything dealing with traffic." According to White, when he does concrete work as a subcontractor, he receives a set of construction drawings from AKC that originate from

---

[1]In her brief, Salas argues that the provisions of chapter 95 of the Texas Civil Practice and Remedies Code do not apply to this case because AKC was not a "property owner" under that chapter. In its brief, AKC points out that the trial court did not grant summary judgment on the basis of chapter 95, pointing to the trial court's letter of May 28, 2014, which informed the parties of its ruling and asked counsel for AKC to submit an order conforming with the ruling. In its letter, the trial court stated that it did "not believe that chapter 95 of the Tx CPRC applie[d] to this case." The trial court then stated, "However, the Court finds that Defendant's Motion for Summary Judgment should be granted on the other grounds stated." As AKC has conceded that the summary judgment cannot be upheld on chapter 95 grounds, we need not address those grounds.

Tx-DOT. White testified that when C&B took over traffic control from AKC, there was a similar "written plan that came to me through AKC and was generated by Tx-DOT." "It's a book with instruction about how you're supposed to place traffic control devices." White testified that he followed the book and that there was an inspector from Tx-DOT present frequently on the work site. The Tx-DOT inspector would check the concrete work and the signage to make sure it complied with the materials in the book. White testified that when the Tx-DOT inspector mentioned the spacing of the signs and cones was not correct, the inspector called an AKC representative who then called White. White then corrected the spacing in the manner desired by Tx-DOT. According to White, this happened maybe twice. White testified that neither the Tx-DOT inspector nor AKC ever criticized how the C&B crew loaded the signs from the storage place and delivered them to the roadway. According to White, when C&B took over traffic control, the crew chief for AKC "helped us set up the first day and that was about how it went." White testified that the crew chief said, "This is how you do it," and White replied, "I got it." White confirmed that once the AKC crew chief gave him a demonstration on how to handle the cones and signs, C&B had control over the process. According to White, no one from AKC was standing over the C&B crew on a day-to-day basis instructing the C&B crew on how to perform traffic control. And, no one from AKC gave any indication about where the men should be riding in their crew truck while placing traffic signs. White testified that the instruction from the AKC crew chief consisted of him saying, "You line [the signs] up 500-foot each direction. We line our cones up like this (indicating)."

Salas argues that the summary judgment record shows that AKC acted in a supervisory capacity with regard to traffic control, emphasizing that AKC provided all the equipment and trained the C&B crew on how the work was to be done. Salas points to evidence showing that AKC representatives informed White on a few occasions that the cones had not been spaced

properly. Salas also points to White's testimony toward the end of his deposition where he testified that the point of the training he was given by the AKC representative was for AKC to instruct C&B on how it wanted the signs and cones to be set out and that White felt he had to follow those instructions and could not pick and choose from amongst the instructions. And, Salas emphasizes White's testimony that he did not feel as though he had the discretion to make decisions about how the signs could be placed if those decisions were inconsistent with how he was instructed to do so by AKC. However, White is clear in his deposition testimony that the "book with instruction about how you're supposed to place traffic control devices" originated from Tx-DOT, not AKC. AKC was just acting as an intermediary. Similarly, White testified that it was the Tx-DOT inspector who complained about the spacing of the signs and traffic cones and that AKC was acting as an intermediary by reporting to White what the Tx-DOT inspector had said.

With respect to the training given to White by the AKC representative, both White and Castillo testified that there was a general demonstration of how to space cones and signs. Such a general demonstration is not evidence that a general contractor retained supervisory control. *See Transit Mix Concrete*, 205 S.W.3d at 95 (explaining that an employer who does not provide detailed instruction on the method or means of how to perform the job does not retain supervisory control over a contractor). Moreover, White clarified in his deposition that at no time did AKC instruct the C&B crew on how to actually move and set out the signs. And, White and Castillo both testified that the only complaints received from AKC were regarding the spacing of the cones and signs. Thus, even if one could conclude that there was an issue of material fact regarding AKC exercising supervisory control over the spacing of the signs and cones, the summary judgment evidence shows there is no "nexus" between such exercise of control and the conduct (straddling the pickup truck) that lead to Suarez's death. *See Hoechst-Celanese Corp*, 967 S.W.2d at 357 (requiring a "nexus" between the general contractor's retained supervisory control and the

condition or activity that caused the plaintiff's injury); *Moritz*, 257 S.W.3d at 214 (explaining that "it is not enough to show that the defendant controlled one aspect of [the plaintiff]'s activities if his injury arose from another"); *Coastal Marine Serv.*, 988 S.W.2d at 226 (noting that "supervisory control retained or exercised must relate to the activity that actually caused the injury"). Based on this summary judgment record, we conclude that AKC did not owe a legal duty to Suarez, C&B's employee.

We therefore affirm the judgment of the trial court.[2]

Karen Angelini, Justice

---

[2] We note that in its brief AKC argues Salas failed to timely perfect this appeal, pointing out that summary judgment was signed by the trial court on June 9, 2014, and Salas did not file her motion for new trial until July 10, 2014 and her notice of appeal until July 11, 2014. First, the summary judgment signed on June 9, 2014 was not a final order because not all of the claims against all of the defendants had been disposed of as of that date. Second, even if the summary judgment signed on June 9, 2014 was a final order, Salas's motion for new trial was mailed on July 9, 2014, and was received within ten days of the deadline. Thus, pursuant to Texas Rule of Appellate Procedure 9.2(b)(1), it was deemed timely filed on July 9, 2014. Third, even if rule 9.2(b)(1)'s mailbox rule did not apply, Salas filed her notice of appeal within the fifteen-day grace period and filed a response sufficient under *Verburgt v. Dorner*, 959 S.W.2d 615, 616 (Tex. 1997). For all these reasons, we have jurisdiction over this appeal.